IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| STEVEN MCPHERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 2:19-cv-2493-SHM-atc |
| | ) |
| REEDY & COMPANY REALTORS, | ) |
| LLC, and JAMES REEDY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is Reedy & Company Relators LLC ("Reedy & Company") and James Reedy's ("Defendants") May 15, 2020 First Sealed Motion for Summary Judgment (the "Motion"). (D.E. No. 27.) Steven McPherson("McPherson") responded on November 2, 2020. (D.E. No. 42.) Defendants replied on December 7, 2020. (D.E. No. 46.) Also before the Court is McPherson's December 14, 2020 Sealed Motion to Strike and Objection to Exhibit R-2 to Defendants' Summary Judgment Reply Brief (the "Motion to Strike"). (D.E. No. 48.) Defendants responded on December 21, 2020. (D.E. No. 49.) McPherson replied on January 4, 2021. (D.E. No. 52.)

## I.  Background

McPherson sues Defendants under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq. McPherson alleges that

Defendants illegally deprived him of overtime compensation. (D.E. No. 1, ¶¶ 16-19.)

Defendant Reedy & Company is a licensed real estate broker. (D.E. No. 27-2, "Statement of Undisputed Facts," ¶¶ 1.)  It constructs its own projects, sells real estate, and provides maintenance, repair, management, and rehabilitation for residential, and commercial real estate in Shelby County, Tennessee. (Id. at ¶¶ 1-2.) Defendants own 150 single family and multi-family residences and manage 1800 single family or duplex residences and 500 apartments. (Id. at ¶ 6.) Defendant James Reedy owns Reedy & Company and related companies. (D.E. No. 46-4, "Johnson Dep.", 9.)

Defendants operate a warehouse (the "Warehouse") that reduces the cost of maintenance, preservation, and restoration for Reedy & Company and its clients. (Statement of Undisputed Facts, ¶ 3.)  The Warehouse contains items needed to "have [a house or apartment] ready for a person to live there." (Id. at ¶ 4.)  Defendants' annual budget is $11,000,000 a year for construction, maintenance, reconstruction, rehabilitation, and repair. (Id. at ¶ 6.)  Defendants average 20 to 25 projects a day. (Id.)  The Warehouse carries paint, plumbing supplies, HVAC, central heaters and air conditioners, refrigerators, stoves, vent hoods, lumber products, and hardware items such as door

knobs, hinges, towel racks, and towel bars. (D.E. No. 46-4, "Reedy Dep.", 23-24.)

Defendants employed McPherson from 2012 until his termination in June 2019. (Statement of Undisputed Facts, ¶ 9.) McPherson also was employed by a subsidiary of Defendants, Value Home Maintenance LLC, from December 2018 through June 2019. (Id. at ¶ 9.) McPherson was the Warehouse manager from 2013 until his termination. (Reedy Dep., 21.)

The central issue is whether McPherson's job duties exempted Defendants from paying him overtime under the FLSA because he fit within the administrative exemption. McPherson was the "Warehouse Manager." (Id. at ¶ 22.) James Reedy testified that a typical day for McPherson began when he opened the Warehouse around 7:00 or 7:30 AM. (Reedy Dep., 25.) McPherson checked out inventory for contractors. (Id.) By around 10:00 AM, the contractors had received their inventory items. (Id.) McPherson then did his paperwork, got back to accounting, ordered inventory, and updated the computer program showing "where he was at all times with different products." (Id.) He would then visit apartments and contractors to make sure that the Warehouse was properly stocked for the renovations. (Id. at 26.) He also opened the Warehouse around 2:00 or 3:00 PM to allow contractors to get materials. (Id.) McPherson closed the Warehouse and was usually done with work between 3:30 and 5:00 PM. (Id.) Reedy

testified that McPherson had the ability to buy the things he needed, like a 40-year-old electrical panel, and that McPherson could stock up on those things. (Id. at 46.)  Reedy testified that McPherson asked for Reedy's opinion on some purchases, but for others, such as a fuel account, McPherson made decisions on his own. (Id. at 47.)

McPherson had a "little office" connected to the Warehouse. (Reedy Dep. at 23.) He moved some inventory items around the Warehouse, but hourly employees also moved items. (Id. at 28.) According to Reedy, McPherson knew more about the Warehouse business than Reedy, and McPherson set up the accounts for Lowe's and other vendors. (Id. at 29.)  Reedy testified that McPherson had the discretion to buy over $100,000 a month in inventory. (Id. at 30.)  Reedy testified that McPherson "had full discretion to keep the warehouse stocked." (Id. at 45.)  McPherson selected, purchased, and used the inventory control system for the Warehouse. (Id. at 51-52.)  McPherson chose the inventory items in the Warehouse. (Id. at 42.)

McPherson testified that he searched for the products required for a job. (D.E. No. 46-2, "McPherson Dep.", 4.)  He negotiated prices and coordinated with vendors, "for the most part." (Id. at 42-44.)  He had business credit cards with his name from American Express, Lowe's, and Home Depot. (Id. at 73.)  He used those cards to purchase items as needed. (Id.)

McPherson testified that some items were inventory items and others were for projects. (Id. at 45.) He testified that he chose the inventory items to stock the Warehouse. (Id. at 42.) McPherson testified that James Reedy would request materials for a project and McPherson would tell Reedy what materials were available. (Id.) McPherson testified that usually he presented multiple vendor quotes to Reedy and Reedy approved the quote he decided was best. (Id. at 53-54.) Once a pricing tier had been agreed with a vendor, McPherson did not need to get Reedy's approval. (Id. at 57-58.) McPherson approached vendors and attempted to negotiate the best price for Defendants. (Id. at 45.) McPherson monitored items that were designated as inventory and documented sales. (Id. at 45-46.) McPherson decided when a delivery would be made to a job site. (Id. at 48.) McPherson testified that he selected, installed, and used the inventory control system in the Warehouse. (Id. at 51.) McPherson testified that the Warehouse generally carried about $100,000 in inventory. (Id. at 71.)

## II.  Jurisdiction

The Court has jurisdiction over McPherson's claim. Under 28 U.S.C. § 1331, United States district courts have original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." McPherson alleges that Defendants failed to pay him overtime compensation

under the FLSA.  (D.E. No. 1, ¶¶ 17-19.)  His claim arises under the laws of the United States.

### III. Standard of Review

Under Federal Rule of Civil Procedure 56, a court must grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The moving party must show that the nonmoving party, having had sufficient opportunity for discovery, lacks evidence to support an essential element of his case.  See Fed. R. Civ. P. 56(c)(1); Peeples v. City of Detroit, 891 F.3d 622, 630 (6th Cir. 2018).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial.  See Fed. R. Civ. P. 56(c).  "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' 'on which a reasonable jury could return a verdict for her.'"  EEOC v. Ford Motor Co., 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting Chappell v. City of Cleveland, 585 F.3d 901, 913 (6th Cir. 2009)).  The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts."  Lossia v. Flagstar Bancorp, Inc., 895 F.3d 423, 428 (6th Cir. 2018)

(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Although summary judgment must be used carefully, it "is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut." FDIC v. Jeff Miller Stables, 573 F.3d 289, 294 (6th Cir. 2009) (quotation marks and citations omitted).

## IV. Analysis

### A. Motion to Strike

Motions to strike are disfavored. Operating Engineers Local 324 Health Care Plan v. G & W Const. Co., 783 F.3d 1045, 1050 (6th Cir. 2015). Rule 12(f) permits a "Motion to Strike" "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Sixth Circuit has held that a motion to strike may be used to strike a pleading, but not an exhibit. Fox v. Michigan State Police Dep't, 173 F. App'x 372, 375 (6th Cir. 2006). Relying on Fox, courts have denied motions to strike exhibits because exhibits are not pleadings. See Robertson v. US Bank, N.A., No. 14-2677, 2015 WL 12532148 at *4-5 (W.D. Tenn. Oct. 20, 2015), aff'd sub nom. Robertson v. U.S. Bank, N.A., 831 F.3d 757 (6th Cir. 2016); Human Rights Def. Ctr. v. Bezotte, No. 11-CV-13460, 2017 WL 1250683 at *15 (E.D. Mich. Mar. 31, 2017).

7

McPherson seeks to strike an affidavit and a summary attached as an exhibit to Defendants' reply.  (D.E. No. 48.)

McPherson's Motion to Strike is **DENIED**.

### B.   Objection to Admissibility of Exhibit

A motion to strike may be construed an objection to the admissibility of an exhibit.  See Osborne v. Nicholas Fin., Inc., No. 3:12-00185, 2014 WL 12774230 at *1 (M.D. Tenn. Dec. 5, 2014) ("other Courts have construed a motion to strike as a request to disregard the disputed material").  Federal Rule of Evidence 1006 permits a party to use a summary to prove the contents of "voluminous writings" that cannot be conveniently examined.  Fed. R. Evid. 1006.

McPherson argues that Attachment 3 to Defendants' reply, Exhibit R-2, is improper new evidence.  Exhibit R-2 is Ted Scott's affidavit and the attached Federal Rule of Evidence 1006 summary ("Scott's affidavit and 1006 summary") showing how many emails McPherson sent and received every day between August 2, 2016, and June 2, 2019.  (D.E. No. 46-3.)  The affidavit was signed on December 7, 2020.  (D.E. No. 46-3.)  Discovery closed on October 1, 2020.  (D.E. No. 37.)  Defendants produced the emails to McPherson in February 2020.  (D.E. No. 28.)  Scott swears that he is a digital forensic examiner, that he reviewed McPherson's work email account, and that McPherson received

8

22,059 emails.  (D.E. No. 46-3, ¶¶ 1-8.) Scott also swears that McPherson sent 4407 emails, and that there were attachments to 799 of his sent emails and 9,571 of his received emails.  (Id. at ¶¶ 6-8.)  The 1006 summary is a chart and graph showing how many emails McPherson sent and received each day.  (Id. at pp. 4-25.)

Scott's affidavit and 1006 summary is not new evidence.  It summarizes evidence already produced.  Defendants produced the emails in February 2020.  (D.E. No. 28.)  There is no requirement that a 1006 summary be produced before the close of discovery. See United States v. Jamieson, 427 F.3d 394, 409-410 (6th Cir. 2005) (a 1006 summary operates independently from discovery, and there is no requirement that the summary be produced); United States v. McArdle, No. 2:20-CR-56-JRG-HBG, 2021 WL 149411 at *7 (E.D. Tenn. Jan. 15, 2021) (no pretrial notice required for 1006 summary, and the opposing party is not entitled to the summary). Scott's affidavit was signed after discovery closed, but Scott's affidavit and 1006 summary is not inadmissible because the underlying emails were produced before discovery closed.

Scott's affidavit and 1006 summary is admissible.  A court may admit a 1006 summary if the following requirements are met:

> (1) the underlying documents are so voluminous that they cannot be conveniently examined in court; (2) the proponent of the summary must have made the documents

9

available for examination or copying at a reasonable time and place; (3) the underlying documents must be admissible in evidence; (4) the summary must be accurate and nonprejudicial; and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

U.S. v. Moon., 513 F.3d 527, 545 (6th Cir. 2008).

There is no dispute that three of the requirements are met. Scott's affidavit and 1006 summary addresses more than 26,000 emails. (D.E. No. 46-3, ¶ 6.) The emails were produced to McPherson in February 2020. (D.E. No. 28.) Scott's affidavit provides the support necessary for the 1006 summary. (See D.E. No. 46-3.)

McPherson argues that the email summary is misleading or prejudicial because Defendants seek to use the large volume of emails to show that McPherson fits within the administrative exemption. McPherson argues that some of the emails were automated responses or not work related. He cites no cases supporting his argument. Defendants' use of Scott's affidavit and 1006 summary to support arguments with which McPherson disagrees does not make Scott's affidavit and 1006 summary misleading or unreliable. Nothing in Scott's affidavit and 1006 summary contains any misleading opinion or information. (See D.E. No. 46-3.) Scott simply swears to the number of emails McPherson sent and received. (See Id. at ¶¶ 6-8.) Scott offers no conclusions about the emails. (See Id.)

10

McPherson argues that Exhibit R-2 is inadmissible because the underlying emails are inadmissible hearsay and irrelevant. Hearsay is an out of court statement made to "prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(1)-(2). Evidence that is not used to prove the truth of the matter asserted is not hearsay. United States v. Hathaway, 798 F.2d 902, 907 (6th Cir. 1986). McPherson argues that the emails are not business records under Federal Rule of Evidence 803(6)(B). The Court need not address the business records exception because Exhibit R-2 is not hearsay. Scott's affidavit and 1006 summary is not being used to prove that the contents of the emails are true. Exhibit R-2 shows the number of emails McPherson sent and received. It contains no reference to the content of the emails that could be used to prove the truth of the matters asserted in them. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed R. Evid. 401(a). Scott's affidavit and 1006 summary is relevant because the volume of emails could make it more or less probable that McPherson was an administrative employee. The Court will not rely on the content of the emails.

McPherson's objection to the admissibility of Exhibit R-2 is **DENIED.**

11

### C.   Summary Judgment

The FLSA allows an employee to bring a private action against an employer for unpaid overtime.  29 U.S.C. § 207; 29 U.S.C § 215.  "An employer who violates the FLSA must pay the affected employee the amount of their unpaid . . . overtime compensation ... and [] an additional equal amount as liquidated damages."  Boaz v. FedEx Customer Information Services, Inc., 725 F.3d 603, 605 (2013) (citing 29 U.S.C. § 216(b)) (internal quotation marks omitted).  This provision dictates that employees cannot be required to work more than forty hours per seven-day week unless they receive overtime compensation at a rate not less than one and one-half times their regular pay.  Elwell v. Univ. Hosps. Home Care Servs., 276 F.3d 832, 837 (6th Cir. 2002) (citing 29 U.S.C. § 207(a)(1)).  Employers who fail to comply with this requirement may be liable to their affected employees in the amount of their unpaid overtime compensation and an equal amount of liquidated damages.  Whaley v. Henry Ford Health Sys., 172 F. Supp. 3d 994, 1001 (E.D. Mich. 2016) (internal quotation marks omitted) (citing Moran v. Al Basit LLC, 788 F.3d 201, 204 (6th Cir. 2015)).

To succeed on an unpaid overtime claim under the FLSA, a plaintiff must establish: "(1) an employer-employee relationship; (2) that the employer or its employees are engaged in interstate commerce; (3) that the employee worked more than

forty hours; and (4) that overtime was not paid." Whaley, 172 F. Supp.3d at 1001 (citations and quotations omitted).  Once a plaintiff has established these elements, the burden shifts to the employer, who must show by a preponderance of the evidence that one of the exemptions afforded by § 213 applies.  Kowalski v. Kowalski Heat Treating, Co., 920 F. Supp. 799, 806 (N.D. Ohio 1996).

The FLSA's exemptions are affirmative defenses to an employer's duty to pay overtime.  See 29 U.S.C. § 213(a)(1)-(19).  The employer has the burden of proving that the employee falls within at least one of those exemptions.  Elwell, 276 F.3d at 837 (citation omitted); see also Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974) (noting the general rule that the application of an exemption under the FLSA is an affirmative defense on which the employer has the burden of proof).  The employer has the burden of proving each element of the claimed exemption.  Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 400 (6th Cir. 2004).

The exemption at issue is whether McPherson was an "employee employed in a bona fide administrative capacity." 29 U.S.C. § 213(a)(1).  Congress left it to the Department of Labor (the "DOL") to define employment in an administrative capacity. Foster v. Nationwide Mut. Ins. Co., 710 F.3d 640, 642 (6th Cir.

2013).  The DOL has promulgated a three-part test.  An employee is within the exemption:

> (1) [who is] Compensated on a salary or fee basis pursuant to § 541.600 . . .
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  [29 C.F.R. § 541.200(a)(1)-(3).]

An employee who satisfies each of these criteria is employed in an administrative capacity.  See Foster, 710 F.3d at 644; Perry v. Randstad Gen. Partner (US) LLC, 876 F.3d 191, 196 (6th Cir. 2017).  The exemption is narrowly construed against the employer.  Renfro v. Indiana Michigan Power Co., 370 F.3d 512, 515 (6th Cir. 2004) ("Renfro I").

McPherson concedes that his salary satisfies the first criterion.  An exempt employee's salary must be "not less than $684 per week." 29 C.F.R. § 541.600(a).  That is about $35,000.00 a year.  McPherson earned $52,961.58 in 2015, $54,184.62 in 2016, $57,702.00 in 2017, and $56,147.86 in 2018.  (D.E. No. 27-4, 2-5.)  In 2019, McPherson earned $21,151.35, and his employment terminated in June.  (Id. at 6; D.E. No. 27-3, ¶ 10.)  His pay stubs show that he earned $2,053.85 every two weeks in 2019.

14

(D.E No. 27-5, 54-69.)   There is no dispute that McPherson's salary satisfies the administrative exemption requirement.

The parties disagree about the second criterion, whether McPherson's primary duty was "the performance of non-manual work directly related to the management or general business operations of the employer or the employer's customers."   See 29 C.F.R. § 541.200(a)(2).   "[A]n employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."   29 C.F.R. § 541.201(a).   "Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities."   29 C.F.R. § 541.201(b).

The second criterion has two parts.   First, the employee's primary duty must be office or non-manual work.   Renfro I, 370 F.3d at 516.   Second, the employee's primary duty must be directly related to the management or general business operations

15

of the employer.  Id.  "Although an exempt employee can perform some manual work without losing exempt status, 'if the employee performs so much manual work (other than office work) that he cannot be said to be basically a "white-collar" employee he does not qualify for exemption as a bona fide administrative employee....'" Schaefer, 358 F.3d at 401-402 (quoting 29 C.F.R. § 541.203(a)).

In Renfro I, the court found that, because planners at a power plant spent more than 50% of their time working at their desks, they primarily performed non-manual work although they performed some ice removal that was manual labor.  Renfro I, 370 F.3d at 516-517. In Shaefer, the Sixth Circuit held that the plaintiff did not perform manual labor when performing inspection tasks such as "inspecting trucks, examining load bracings, inspecting shipping containers, and examining shipping labels." Shaefer, 358 F.3d at 402.  The court found that the plaintiff performed manual labor "when he actually pick[ed] up a hammer to brace a load or install[ed] or tighten[ed] a strap." Id.  The court concluded that the plaintiff's primary duty was non-manual work.  Id.  "A job duty that occupies less than fifty percent of the employee's time can still be the primary duty if that duty is of principal importance to the employer or if the other duties performed are collateral to that duty." Id. at 401.

16

In Hundt v. DirectSat USA, LLC, the plaintiff was a warehouse manager for a satellite television installation company. Hundt v. DirectSat USA, LLC, 294 F.R.D. 101, 102-103 (N.D. Ill. July 1, 2013). The court in Hundt concluded that the plaintiff's performance of some manual labor did not preclude exemption because his primary duty was the performance of non-manual work. Id. at 112. The plaintiff considered himself the warehouse manager and "he spent between one-third and three-quarters of his time performing non-manual duties such as tracking and managing inventory on the computer." Id.

The parties disagree about whether McPherson's primary duty was the performance of manual or non-manual work. McPherson did some manual work, such as moving items around the Warehouse. (See Reedy Dep., 28.) He also did a significant amount of non-manual work. McPherson negotiated with vendors (McPherson Dep., 42-43), kept the Warehouse stocked (Id. at 43-44), coordinated ordering supplies for projects (Id. at 44), and set up accounts (Reedy Dep., 29). McPherson had an office attached to the Warehouse, and he sent and received emails through a computer. (McPherson Dep., 36-37.) McPherson received more than 22,000 emails and sent more than 4,000 emails between 2016 and 2019. (D.E. No. 46-3.) McPherson did some manual work, but the proof establishes that his primary duty was non-manual work.

The "administrative-production dichotomy" is often used to determine whether an employee's work is directly related to the management or general business operations of the employer. Foster, 710 F.3d at 644.   Employees are production employees when they "generate the product or service the business offers to the public." Id. at 644. Not every situation fits within this dichotomy. Schaefer, 358 F.3d at 402-403.   The Sixth Circuit has held that planners at a power plant were administrative employees because their duties were related to servicing the business of selling electricity. Renfro I, 370 F.3d at 517-518.

McPherson's work was directly related to Defendants' management and their general business operations.  Defendants' business is selling, managing, and renting apartments and houses. (See Reedy Dep., 7-8.)  Defendants use the Warehouse to provide all of the materials needed to do renovations or "turn" apartments after tenants move out.   (Id. at 23-24.)   The Warehouse reduces time and cost for renovations and repairs. (Statement of Undisputed Facts, ¶ 3.)  McPherson's management of the Warehouse was directly related to Defendants' general business operations, rather than production or selling.  He did not work on a manufacturing production line or sell or rent Defendants' products, apartments and houses.

Non-manual work was McPherson's primary duty.  McPherson managed the Warehouse, which kept an inventory of $100,000 (McPherson Dep., 71.) and supplied materials for the maintenance and repair of Defendants' rental company. (Reedy Dep., 22.) McPherson did some manual work, but most of his day was spent managing the Warehouse, not physically moving items.  (See Reedy Dep., 22-23.)  There is no genuine dispute of material fact that McPherson's non-manual management of the Warehouse, not ancillary manual work, was his primary duty and that it was directly related to the management of Defendants' business.

The parties disagree about the third criterion, whether McPherson's "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance."  See 29 C.F.R. § 541.200(a)(2).  An employee must use discretion and independent judgment "customarily and regularly."  Schaefer, 358 F.3d at 403-404.  "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a).

The DOL has promulgated the following factors for courts to consider:

(b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

"The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific

standards described in manuals or other sources." 29 C.F.R.
541.202(e).

Interpreting the DOL's guidelines, courts have considered
how to determine whether an employee is making an independent
choice or exercising discretion. In <u>Renfro I</u>, the court held
that planners exercised discretion and independent judgment in
formulating solutions to issues at a nuclear power plant despite
the significant number of regulations the planners had to follow.
<u>Renfro I</u>, 370 F.3d at 518-519. In <u>Renfro II</u>, the court held
that technical writers exercise discretion and independent
judgment because "[t]hey do not work under constant supervision
and, when preparing a procedure, select the best method to
maintain the plant's equipment." <u>Renfro v. Indiana Michigan
Power Co.</u>, 497 F.3d 573, 577 (6th Cir. 2007) ("<u>Renfro II</u>"). The
court concluded that two technical writers could solve the same
problem in two different and equally effective ways. <u>Id.</u> at
577-578.

In <u>Lutz v. Huntington Bancshares, Inc.</u>, the court held that
underwriters exercised independent judgment and discretion "[b]y
imposing stipulations, creating exceptions, proposing
counteroffers, and flagging applications." <u>Lutz v. Huntington
Bancshares, Inc.</u>, 815 F.3d 988, 997 (6th Cir. 2016). In <u>Foster</u>,
the court found that insurance company special investigators
exercised discretion and independent judgment in resolving

whether fraud occurred and determining the legitimacy of suspicious claims. Foster, 710 F.3d at 649. In Schaefer, the court found a genuine dispute of material fact about whether the plaintiff exercised discretion and independent judgment in performing shipping tasks. Schaefer, 358 F.3d at 403-406. In Perry, the court found that an account manager fit within the administrative exemption even when her work was reviewed by supervisors daily. Perry, 876 F.3d at 209. In Hundt, the court concluded that the plaintiff exercised discretion and independent judgment when allocating equipment to technicians to prevent them from hoarding equipment. Hundt, 294 F.R.D. at 112.

McPherson's primary duty required the exercise of discretion and independent judgment. McPherson argues that he did not have discretion to make an independent choice because Reedy could review his decisions and made the decision to purchase items, such as roofing, for projects. A supervisor's review or approval does not necessarily mean that the employee does not exercise discretion and independent judgment. 29 C.F.R. § 541.202(c). Providing recommendations can satisfy that standard. See Id. McPherson researched items and their prices for projects and chose the inventory items in the Warehouse. (McPherson Dep., 42.) McPherson negotiated with vendors on prices. (Id. at 45.) McPherson would get quotes from multiple vendors and approach Reedy to get approval to make purchases for

projects, like roofing.  (McPherson Dep., 53-54.)  McPherson and
Reedy both testified that McPherson chose the inventory items in
the Warehouse.  (McPherson Dep., 42; Reedy Dep., 45.)  McPherson
traveled to Defendants' apartments to determine the items he
needed to purchase.  (Id. at 22.)  He managed the timing of
deliveries.  (McPherson Dep., 48.)  He selected, purchased, and
operated the Warehouse inventory control system.  (Reedy Dep.,
51-52; McPherson Dep., 53.)  McPherson held multiple company
credit cards that he used as needed.  (McPherson Dep., 73.)  He
set up accounts for Defendants with companies such as Lowe's.
(Reedy Dep., 29.)   McPherson's primary duty required the
exercise of discretion and independent judgment.  He made
recommendations and decisions for the Warehouse, although Reedy
approved some of his purchases.

The exercise of discretion, must relate to "matters of
significance."   The court in Lutz held that underwriters'
decisions significantly affected the business and bound the
company to the risk of loans.  Lutz, 815 F.3d at 997.  The court
found that the underwriters were exercising discretion and
independent judgment as to matters of significance.  Id.   In
Foster, the court concluded that special investigators'
determinations about the legitimacy of insurance claims were
matters of significance for the defendant insurance company.
Foster, 710 F.3d at 650.  In Hundt, the warehouse manager did

not contest the significance of the work.  See <u>Hundt</u>, 294 F.R.D. at 112.

McPherson's decisions were related to matters of significance.  The Warehouse was a matter of significance to Defendants because the Warehouse supplied materials for the apartments Defendants maintained and managed.  (Statement of Undisputed Facts, ¶ 3.)  The Warehouse reduced the cost of maintenance, preservation, and restoration for Defendants and their clients.  (<u>Id.</u>)  The Warehouse contained over $100,000 in inventory.  (McPherson Dep., 71.)  These were matters of significance to Defendants.  There is no genuine dispute of material fact about McPherson's exercise of discretion with respect to matters of significance to Defendants.

Defendants have met their burden.  McPherson was employed in a bona fide administrative capacity.  His claim that Defendants violated the FLSA's overtime requirement is **DISMISSED.**

## V.   Conclusion

McPherson's Motion to Strike is **DENIED.**  Defendants' Motion is **GRANTED.**  McPherson's claim for FLSA overtime pay is **DISMISSED.**

SO ORDERED this 16th day of March, 2021.


*/s/ Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE